SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Izaia M. Bullock** (A-34-21) (086196)

**Argued November 28, 2022 -- Decided May 9, 2023**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

In this appeal, the Court considers whether a two-step interrogation in which officers questioned the defendant, obtained admissions, and thereafter advised defendant of his <u>Miranda</u> rights warrants suppression of defendant's statements.

In October 2018, Rutgers University Police were dispatched to a campus residence hall to investigate reports that a student, defendant Izaia Bullock, had threatened to harm his girlfriend's parents. Upon arriving, Rutgers Police Officer Peter Archibald saw defendant standing in the hallway. Officer Archibald escorted defendant to the courtyard of the building, where they met two other officers.

While in the courtyard, defendant was not in handcuffs. The officers were in full uniform and armed. Without administering <u>Miranda</u> warnings, Officer Archibald asked, "why are we here tonight?" Defendant said it was "[b]ecause [he] made a statement" about "want[ing] to harm" his "girlfriend and her family." After defendant provided his girlfriend's name, the officers moved him from the middle of the courtyard towards a building. The rest of the courtyard questioning took place with defendant's back up against the building, with the three officers in front of him. After further exchanges, Officer Archibald told defendant, "[Y]ou are not under arrest. You are not in trouble. I'm going to advise you of your <u>Miranda</u> rights, okay?" He then provided a recitation of the <u>Miranda</u> rights but did not have defendant execute a <u>Miranda</u> waiver form because none were available at that location. Officer Archibald did not ask defendant if he wanted to waive his rights and answer the officers' questions. Rather, after administering the <u>Miranda</u> rights, asking if defendant understood them, and receiving no audible answer, Officer Archibald immediately resumed questioning, during which defendant stated, when asked what he had said earlier, "I said I would kill my girlfriend's parents."

The questioning continued until another officer on the scene received a call from the police captain directing the officers to bring defendant to headquarters. Defendant asked, "Do I gotta sit in the back, like I'm getting arrested?" Officer Archibald replied, "No, you're not getting arrested."

1

At headquarters, defendant waited in an interview room approximately four hours for the interrogation to begin. Detective Lauren Tredo told defendant that "since you're here" at the police station she was going to give him his rights. Detective Tredo then told defendant, "I know you spoke with officers prior. But we just have to do it again." In advising defendant of his rights, Detective Tredo instructed defendant: "after each one, just acknowledge that you understand by saying yes or no, okay?" Detective Tredo then administered defendant's <u>Miranda</u> rights and defendant verbally affirmed his understanding after each one. Detectives then instructed defendant to read the following statement out loud: "I have been advised of my rights, and I understand what my rights are." Defendant then signed and initialed the form as instructed. Throughout the questioning that followed, defendant detailed his potential plan and the steps he had taken thus far.

Defendant was charged with attempted murder and conspiracy to commit murder. The State moved to admit defendant's statements from his interrogations. The hearing judge found defendant's statements in the courtyard inadmissible, reasoning that the State failed to show a proper administration and waiver of defendant's <u>Miranda</u> rights. The court next found defendant's statements at police headquarters inadmissible because Detective Tredo similarly failed to ask defendant if he understood his rights and if he was willing to waive his rights and answer the officers' questions. The trial judge further explained that the officers' conduct in presenting defendant's rights relegated <u>Miranda</u> to a mere administrative formality.

The Appellate Division affirmed. As to the stationhouse statements, the court relied, in part, on the since-overturned Appellate Division decision in <u>State v. Sims</u>, 466 N.J. Super. 346, 367 (App. Div. 2021), in concluding that the "failure to inform defendant of the charges for which he was being placed under arrest was fatal to eliciting a valid waiver." The Court granted leave to appeal. 249 N.J. 348 (2021).

**HELD:** Defendant's statements in the courtyard and stationhouse were both properly suppressed. Under the totality of the circumstances, the courtyard statements must be suppressed because the <u>Miranda</u> warnings given in the courtyard were lacking and could not have apprised defendant of his rights such that any waiver and agreement to speak to police was knowingly, voluntarily, and intelligently made. By the time defendant arrived at the police department and was given full <u>Miranda</u> warnings, he had already admitted to the very crime that the officers were investigating. Defendant had "let the cat out of the bag" with his admissions, <u>see</u> <u>State v. Carrion</u>, 249 N.J. 253, 275-76 (2021), so the psychological pressure of having already confessed was not cured by the administration of <u>Miranda</u> warnings prior to the interview at the station.

1. A confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her

2

constitutional rights through the Miranda warnings. After an individual is given Miranda warnings and apprised of the rights, that person "may waive effectuation of [those] rights, provided the waiver is made voluntarily, knowingly and intelligently." Miranda v. Arizona, 384 U.S. 436, 444 (1966). To establish that an individual waived the Miranda rights under New Jersey law, the State must prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances. The Court has held that police should scrupulously avoid making comments that minimize the significance of the suspect's waiver of the Miranda rights. (pp. 25-28)

2. At issue in this appeal is a two-step "question-first, warn-later" interrogation, where police elicit incriminating statements from a defendant before administering Miranda warnings. State v. O'Neill, 193 N.J. 148, 180-81 (2007). In O'Neill, the Court held that when police elicit incriminating information during a custodial interrogation and only afterwards administer Miranda warnings, "the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination." Ibid. And the Court adopted a non-exhaustive list of five factors for courts to consider when assessing whether the warnings provided in the second interrogation functioned effectively. Id. at 181. "In a two-step interrogation case, courts must view the totality of the circumstances in light of the relevant factors and then determine whether the unwarned questioning and admissions rendered the Miranda warnings ineffective in providing a defendant the opportunity to exercise the privilege." Id. at 181-82. The Court reviews its application of the O'Neill factors in Carrion. (pp. 28-32)

3. As to the courtyard statements, with three uniformed, armed officers surrounding defendant and asking him questions about the alleged threats in the courtyard, it is hard to imagine that a reasonable person in defendant's position would have felt free to leave. Defendant was in custody as the officers questioned him in the courtyard, and he should have been read his Miranda rights prior to Officer Archibald asking questions that were reasonably likely to elicit an incriminating response. But it was not until after defendant admitted that he had stated that he "want[ed] to harm someone," specifically, "[his] girlfriend and her family," that Officer Archibald advised defendant of his right to remain silent in an abridged version of the Miranda rights. There was no Miranda form available to the officers at the time, so the warnings were not a full recitation of the advice of rights Miranda requires. Furthermore, prior to providing defendant with the inadequate Miranda rights, Officer Archibald undermined those rights by telling defendant, who was at that point in police custody and a suspect in an attempted murder investigation, that he was "not in trouble" -- an affirmative misrepresentation. (pp. 32-35)

3

4.  As to the stationhouse statements, application of the O'Neill factors weighs in favor of suppression.  Although the pre-Miranda questioning in the courtyard did not last long, the substance of defendant's admissions was significant.  The first factor -- the extent of questioning prior to being informed of Miranda and the nature of any admissions -- therefore weighs in defendant's favor.  The second and third factors, the proximity in time and place between the pre- and post-warning questioning and whether the same law enforcement officers conducted both statements, weigh in favor of admitting the statements.  Regarding factor four, the detectives did not inform defendant that his prior statements could not be used against him, so this factor weighs in defendant's favor.  Defendant was still operating under the psychological and practical disadvantages of having confessed prior to the stationhouse interrogation.  This factor weighs heavily against admission.  The final factor -- whether the post-warning questioning was a continuation of the pre-warning questioning -- likewise weighs in favor of suppression.  Prior to the start of the police station interrogation, Detective Tredo stated that she was aware defendant previously spoke to the other officers, "[b]ut we just have to do it again."  Detective Tredo further noted that "patrol took a statement" regarding the comments defendant made.  Linking the pre- and post-warning statements together in that manner and giving defendant the impression that the statement at the police station was a repeat of the statements he already made certainly could have given defendant the impression that the post-warning statement was simply a continuation of the first.  It is also important to acknowledge defendant's lack of familiarity with the criminal justice system.  Under those circumstances, the Miranda warnings administered at the police station did not give defendant "a meaningful opportunity to exercise his rights," so defendant's waiver prior to the second interrogation was not made knowingly, voluntarily, and intelligently.  See O'Neill, 193 N.J. at 180.  (pp. 36-38)

5.  In light of the Court's holding in State v. Sims that when neither a complaint nor an arrest warrant has been issued, law enforcement officers are not required to inform an arrestee of what charges the arrestee may be facing prior to conducting an interrogation, see 250 N.J. 189, 217 (2022), the appellate court's partial reliance on the now-reversed Appellate Division holding in Sims is no longer viable.  In its ruling, however, the Appellate Division noted that the factors cited by the trial court under the totality of the circumstances analysis "also support the conclusion that there was no valid waiver," as the Court now holds.  (pp. 38-39)

**AFFIRMED AS MODIFIED.  REMANDED to the trial court.**

**CHIEF JUSTICE RABNER; JUSTICES PATTERSON, WAINER APTER, and FASCIALE; and JUDGE SABATINO (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion.  JUSTICE SOLOMON did not participate.**

4

SUPREME COURT OF NEW JERSEY

A-34 September Term 2021

086196

State of New Jersey,

Plaintiff-Appellant,

v.

Izaia M. Bullock,

Defendant-Respondent.

On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| November 28, 2022 | May 9, 2023 |

Patrick F. Galdieri, II, Assistant Prosecutor, argued the cause for appellant (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the briefs).

Rochelle Watson, Deputy Public Defender II, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Rochelle Watson, of counsel and on the briefs, and Michele E. Friedman, Assistant Deputy Public Defender, on the briefs).

Frank Muroski, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Frank Muroski, of counsel and on the brief).

1

John McNamara, Jr., argued the cause for amicus curiae County Prosecutors Association of New Jersey (Jeffrey A. Sutherland, President, County Prosecutors Association, attorneys; John McNamara, Jr., of counsel and on the brief).

Janie Byalik argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; Janie Byalik, on the brief).

Christina Monica François, of the New York bar, admitted pro hac vice, argued the cause for amicus curiae Centurion Ministries, Inc., d/b/a Centurion (Centurion, attorneys; Paul Casteleiro and Christina Monica François, on the brief).

---

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

---

In this appeal, we must determine whether a two-step interrogation in which officers questioned the defendant, obtained admissions, and thereafter advised defendant of his Miranda[1] rights warrants suppression of defendant's statements.

In October 2018, Rutgers University Police received a report that defendant Izaia Bullock had made some concerning statements to another student about harming his girlfriend's parents. When Officer Peter Archibald arrived to speak to the other student, he encountered defendant in the hallway

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

2

of a campus residence hall. After a brief discussion, Officer Archibald escorted defendant out of the building into the adjacent courtyard where they were met by two additional uniformed, armed Rutgers Police officers. Before advising defendant of his <u>Miranda</u> rights, Officer Archibald asked defendant why the officers were there, and defendant stated that he made a statement about wanting to hurt someone, specifically "[m]y girlfriend and her family." After defendant made that admission, Officer Archibald advised defendant that he was "not in trouble" and then recited a cursory version of the <u>Miranda</u> warnings to defendant. Although it is unclear whether defendant affirmatively waived his rights, Officer Archibald immediately resumed the questioning and defendant made further admissions, including an admission that he "said he would kill [his] girlfriend's parents."

After being transported to police headquarters, detectives administered <u>Miranda</u> warnings and defendant signed a waiver form. Two Rutgers Police detectives subsequently conducted a video-taped interrogation. Prior to the interrogation, one of the detectives stated that she was aware defendant already spoke to the officers and stated, "[b]ut we just have to do it again." Defendant made additional incriminating statements, including details of his plan to kill his girlfriend's parents.

Prior to trial, the trial court suppressed all of defendant's statements, finding that he was in custody in the courtyard and should have been properly advised of his rights, which did not occur. The trial court also suppressed the statements defendant made at the police station because of improper administration and waiver of <u>Miranda</u> rights.

The Appellate Division affirmed, agreeing with the trial court that defendant's statements in the courtyard must be suppressed. The Appellate Division also held that defendant's statements at the police station must be suppressed, relying in part on the now-overruled Appellate Division decision in <u>State v. Sims</u> to find that defendant's <u>Miranda</u> waiver was invalid because he was not advised of the potential charges against him for which the officers had probable cause to arrest. <u>See</u> 466 N.J. Super. 346, 367 (App. Div. 2021), <u>rev'd and remanded</u>, 250 N.J. 189, <u>reconsideration denied</u>, 250 N.J. 493, <u>cert. denied</u>, 143 S. Ct. 409 (2022). The Appellate Division also noted that the totality of the circumstances supported suppression.

For the reasons below, we affirm as modified the holding of the Appellate Division suppressing all of defendant's statements.

The following facts are derived from the record developed at the suppression hearing.

On October 29, 2018, at approximately 8:30 p.m., Rutgers University Police were dispatched to a campus residence hall to investigate an incident involving a student, defendant Izaia Bullock. Someone informed Rutgers Police that another student, M.C., had a recording of defendant threatening to harm his girlfriend's parents, and other students had reported overhearing a statement about someone "harming someone's parents." Upon arriving at the residence hall, Rutgers Police Officer Peter Archibald went to meet with M.C. while his two partners looked for the other students who had called in the reports.

As Officer Archibald walked down the hallway of the residence hall, he saw defendant, whom he recognized from photographs, standing in the hallway outside of M.C.'s room. Officer Archibald's body-worn camera captured the events that followed. Officer Archibald approached defendant, addressed defendant by his first name, and advised defendant that he was there to investigate "an incident." Defendant confirmed that he was Izaia Bullock.

Officer Archibald testified that defendant "appeared surprised" by the police presence in the dorm. Officer Archibald told defendant that "some concerns . . . have been raised," and defendant acknowledged that he "already talked to [his] coach" about what happened. Officer Archibald responded, "Well, we got to, we got to figure this out, okay? . . . [S]omething was said, and we're now involved." Officer Archibald asked defendant for his driver's license, which defendant provided. Officer Archibald testified that at this point, though defendant was not under formal arrest, he was not free to leave. Officer Archibald radioed for his fellow officers to meet him in the dorm, but when the other officers could not find his location, Officer Archibald escorted defendant to the courtyard of the building, where they met the two officers.

While in the courtyard, the officers spoke with defendant. Defendant was not in handcuffs. The officers were in full uniform and armed. Without administering Miranda warnings to defendant, the following questioning occurred:

> OFFICER ARCHIBALD: Okay. So, hang that right here, man, right here. So, why are we here tonight?
>
> DEFENDANT: Because I made a statement.
>
> OFFICER ARCHIBALD: What statement did you make?
>
> DEFENDANT: Like, I want to harm someone.

6

OFFICER ARCHIBALD:  Okay.

DEFENDANT:  How are you doing?

OFFICER ARCHIBALD:  Who is the person?

DEFENDANT:  My girlfriend and her family.

OFFICER ARCHIBALD:  Okay.

DEFENDANT:  But, it was just like, I was stressed out earlier in the day.

OFFICER ARCHIBALD:  Hold on.  Let me just start with, what's your girlfriend's name?

DEFENDANT:  Are you reporting this to her?

OFFICER ARCHIBALD:  Not right now, but we have to investigate what was said, okay, because something was told --

DEFENDANT:  (inaudible)

OFFICER ARCHIBALD:  Look, we're, we're a little past that right now, okay?  This has gone way above my head, way above your head.  There are people that are much bigger than all of us involved in this right now.

DEFENDANT:  Right.

OFFICER ARCHIBALD:  Okay.

(Multiple conversations on audio)

7

At this point, the officers moved defendant from the middle of the courtyard towards a building. The rest of the courtyard questioning took place with defendant's back up against the building, with the three officers in front of him.

> UNIDENTIFIED [OFFICER]: (inaudible) We got to get through this, all right? I'm going to ask you a bunch of questions (inaudible).
>
> . . . .
>
> OFFICER ARCHIBALD: So, this is, this is above our heads. So, --
>
> DEFENDANT: Okay. I'm sorry.
>
> OFFICER ARCHIBALD: I have to follow my procedure, (inaudible) happened here. Okay?
>
> DEFENDANT: Yeah.

Officer Archibald proceeded to ask defendant for his girlfriend's biographical information, such as her name and address. The conversation continued as follows:

> DEFENDANT: This is not going to be cool -- (inaudible).
>
> OFFICER ARCHIBALD: Okay. I understand you may not --
>
> DEFENDANT: I'm just having a (inaudible).

8

OFFICER ARCHIBALD:  Okay.

DEFENDANT:  I'm just speaking out loud.

OFFICER ARCHIBALD:  Yeah.

DEFENDANT:  Like I, like I understand what you're saying.  It's just like, (inaudible) --

. . . .

OFFICER ARCHIBALD:  Okay.  Look before any of this goes anywhere else right now, you are not under arrest.  <u>You are not in trouble.</u>  I'm going to advise you of your <u>Miranda</u> rights, okay?

DEFENDANT:  Yes.

[(emphasis added).]

Officer Archibald then provided the following recitation of defendant's

<u>Miranda</u> rights:

OFFICER ARCHIBALD:  You have the right to remain silent.  Anything you say can and will be taped in a court of law.

DEFENDANT:  Can I put, I --

OFFICER ARCHIBALD:  Yeah, absolutely, man. You have the right to an attorney.  If you cannot afford an attorney, one will be appointed to you before any questioning if you wish, okay?  <u>You can decide at any time to exercise your rights and not answer any</u>

9

questions or make any statements.[2]  Do you understand the rights?

> DEFENDANT:  (No audible answer).

Officer Archibald was asked at the suppression hearing whether he "executed a Miranda waiver form at the time of the statement," and he replied, "Not at the time, because there was none available, given our current location."  Additionally, Officer Archibald did not ask defendant if he wanted to waive his rights and answer the officers' questions.  Rather, after administering the Miranda rights, asking if defendant understood them, and receiving no audible answer, Officer Archibald immediately resumed questioning:

> OFFICER ARCHIBALD:  Okay.  What did you say tonight?
>
> DEFENDANT:  I said, that, like, I would definitely harm my girlfriend's parents.
>
> OFFICER ARCHIBALD:  What, what, did you say kill?  Like, how, what was the exact phrase you said?
>
> DEFENDANT:  (inaudible)  That exact phrase that you just said.

---

[2]  As to the underlined portion, due to a discrepancy between the bodycam video and the transcript of those conversations, after oral argument, the parties reached general agreement as to what the officer said in the video.  We rely on the generally agreed upon language in this opinion.

10

OFFICER ARCHIBALD:  Please say it to me.

DEFENDANT:  I said I would harm my girlfriend's parents, as in, like, kill them.

OFFICER ARCHIBALD:  Exactly.  Phrase as exactly as you said it.

DEFENDANT:  Like, that's what I said.

OFFICER ARCHIBALD:  Just say it.

DEFENDANT:  I just said, I would (inaudible).

OFFICER ARCHIBALD:  You will harm?  Or you will kill?

DEFENDANT:  I said I would kill my girlfriend's parents.

OFFICER ARCHIBALD:  That's what you said.

DEFENDANT:  Yes.

The questioning continued until another officer on the scene received a phone call from the police captain, directing the officers to bring defendant to Rutgers University police headquarters.  Officer Archibald then told defendant, "You got to come with us, okay?  So, we're going to take a ride." Defendant responded, "All right."  From the time Officer Archibald first encountered defendant inside the dorm hallway to the point where they left for headquarters, approximately 10 minutes had elapsed.

11

As defendant and Officer Archibald were walking to the police car, defendant asked, "Do I gotta sit in the back, like I'm getting arrested?" Officer Archibald replied, "No, you're not getting arrested." While driving to headquarters, Officer Archibald and defendant casually discussed matters unrelated to the investigation. Defendant told him he had never been in a police car before.

During the drive, defendant asked, "When I get in there, what is the process?" Officer Archibald responded that he did not know yet, but that defendant was not under arrest and that people higher up than him wanted to speak to defendant. Defendant asked if he could just "walk in" to the police station when they got there. Officer Archibald again reassured defendant, "you're walking in with us, you're not under arrest . . . others want some reassurance given the incident."

Upon arriving at police headquarters, defendant waited in an interview room while police interviewed M.C. and listened to his recording of defendant's statements. Defendant waited approximately four hours for the interrogation to begin. At approximately 12:45 a.m., Detective Lauren Tredo and Detective-Sergeant Carlos Rodriguez of the Rutgers Police Department

12

entered the interrogation room.[3] The detectives introduced themselves, and Detective Tredo told defendant that "since you're here" at the police station she was going to give him his rights. Detective Tredo then told defendant, "I know you spoke with officers prior. But we just have to do it again." (emphasis added). In advising defendant of his rights, Detective Tredo instructed defendant: "after each one, just acknowledge that you understand by saying yes or no, okay?"

Detective Tredo then administered defendant's Miranda rights and defendant verbally affirmed his understanding after each one:

> DETECTIVE TREDO: You have the right to remain silent.
>
> DEFENDANT: Uh hum.
>
> DETECTIVE TREDO: Anything you say can and will be used against you in a court of law.
>
> DEFENDANT: Correct.
>
> DETECTIVE TREDO: You have the right to talk to a lawyer and have a lawyer present while you're being questioned. Yes or no?
>
> DEFENDANT: Yeah. Sorry.

---

[3] Defendant initially waited in a room used for victims of domestic violence, which Detective Tredo described as a "nice setting, with couches and two cushion chairs." At some point during the four hours, defendant was moved to a traditional interview room.

13

DETECTIVE TREDO: If you cannot afford to hire a lawyer, one will be appointed to represent you before for any questioning, if you wish.

DEFENDANT: Yeah.

DETECTIVE TREDO: You can decide at any time to exercise these rights and not answer any questions or make any statements.

DEFENDANT: True. Yes.

Detectives then instructed defendant to read the following statement out loud: "I have been advised of my rights, and I understand what my rights are." Defendant then signed and initialed the form as instructed by Detective Tredo.

Detective Tredo informed defendant that he was at the police station "because of comments" that he made and informed him that "patrol took a statement." Detectives Tredo and Rodriguez then asked defendant to walk them through the whole incident, and defendant made several inculpatory statements. Defendant stated that he was "stressed out" and admitted that he made comments earlier that day that he would kill his girlfriend's parents.

Throughout the questioning, defendant detailed his potential plan, the steps he had taken thus far, and his discussions with M.C.. Defendant admitted that he planned to drug his girlfriend's mother with Tylenol, kill her father, and that he asked M.C. to be his getaway driver. Defendant described

14

physical evidence -- work gloves and a bag of crushed-up Tylenol pills -- that he had put in his car earlier that day but had since removed and placed in his dresser at home. Defendant also admitted to using his cell phone to search for his girlfriend's parents' address to see if the house had any cameras.

Detective Rodriguez asked defendant if he would provide the police with consent to search his car and cell phone, and defendant responded that he would need to talk to his parents first. Defendant expressed confusion as to why he wasn't getting his phone back, and Detective Tredo informed him that "while we were speaking before, you said there's now evidence on that phone. . . . So, what I'm saying is, you can consent to [the search], and I will do the forensic examination, or I will apply for a search warrant." Defendant then consented to the search of his car and cell phone, expressing that he did not want to "end up being here 15 hours longer."

A little over an hour into the interrogation, defendant asked the detectives, "[s]o, I can go to jail for making comments?" to which Detective Rodriguez responded, "yeah, you could." Defendant asked how much longer he would be held, and the detectives explained that they could not provide him a definite answer. Defendant then asked how long police usually hold someone for questioning and apologized, noting that the experience was "all

15

new to [him]." Detective Rodriguez replied that he did not know. The interrogation concluded around 2 a.m.

Defendant remained in the interview room from 2 a.m. to 7 a.m. At 7 a.m., Detectives Tredo and Rodriguez returned to the interview room. Detective Rodriguez stated, "We're back in here. We're going to ask you a few more questions, and I got to read your rights, okay?" Detective Rodriguez read defendant his Miranda rights and defendant verbally acknowledged that he understood. Again, defendant was instructed to read the following statement out loud: "I have been advised of my rights, and I understand what my rights are." Defendant again signed and initialed the form as instructed. In the brief interrogation that followed, defendant told detectives that he spoke with his coach on the phone about the statements he made.

Later that day, a complaint-warrant was issued against defendant charging him with two counts of first-degree attempted murder and two counts of first-degree conspiracy to commit murder. The attempted murder charges alleged that defendant "acquir[ed] gloves, crush[ed] up Tylenol, possess[ed] a mask, look[ed] up the location of the victim[s'] residence and solicit[ed] the assistance of another in the commission of the crime[s]." The conspiracy to commit murder charges alleged that defendant "ask[ed] another to be the getaway driver and lookout."

16

B.

A Middlesex County grand jury later returned a four-count indictment, charging defendant with two counts of first-degree attempted murder and two counts of first-degree conspiracy to commit murder.

The State moved to admit defendant's statements from his interrogations, and the court conducted a hearing to determine the admissibility of those statements. At the hearing, Officer Archibald and Detective Tredo testified. The State played Officer Archibald's body-cam footage from the time he first encountered defendant in the residence hall up to, but not including, the drive to police headquarters. The State also played the footage of defendant's interrogations at the police station. The defense did not produce any witnesses at the hearing but cross-examined the officers.

The hearing judge issued an oral decision and found defendant's statements inadmissible, reasoning that the State failed to show a proper administration and waiver of defendant's Miranda rights. Regarding defendant's interaction with Officer Archibald in the courtyard, the court found that defendant was "clearly" in custody, despite Officer Archibald advising defendant that he was not under arrest. The court found that the officers' questioning of defendant before administering Miranda warnings "resulted, and . . . elicited incriminat[ing] responses from [defendant]." The

17

court ultimately suppressed all of defendant's statements in the courtyard because Officer Archibald "never asked, do you understand the rights, [and] are you willing to waive them and answer my questions."[4] The court found that because the officers never asked those two questions, the State could not show beyond a reasonable doubt that defendant waived his Miranda rights.

The court next found defendant's statements to Detectives Tredo and Rodriguez at police headquarters inadmissible because Detective Tredo similarly failed to ask defendant if he understood his rights and if he was willing to waive his rights and answer the officers' questions. The court again found that the State could not prove beyond a reasonable doubt that defendant waived his rights because of this deficiency in the administration of the warnings and waiver of rights.

In a written amplification of his oral decision, the trial judge further explained that the officers' conduct in presenting defendant's rights relegated Miranda to a mere administrative formality. The court explained that Detective Tredo's references to defendant's prior conversation with Officer

---

[4] Officer Archibald did ask defendant if he understood his rights, but defendant did not provide an audible answer. Though Officer Archibald testified that defendant "shook his head up and down," the trial court judge did not make a factual finding as to whether defendant nodded his head. In a footnote, the Appellate Division noted that "defendant appeared to nod his head very slightly."

18

Archibald presented itself as a gateway into further discussion about that conversation, and the detectives "engaged in discussion as if they were simply continuing that prior conversation with Officer Archibald."

Regarding the physical evidence seized pursuant to defendant's consent to search, the trial court found that the State failed to prove that defendant's consent was voluntary and suppressed the evidence.

C.

The State appealed, arguing that the trial court erred in suppressing defendant's statements and the physical evidence. The Appellate Division found no error in the suppression of defendant's statements and affirmed their suppression in an unpublished decision. The Appellate Division reversed as to the physical evidence, finding that the State had demonstrated that defendant knowingly and voluntarily consented to the search, but remanded for a determination of whether the physical evidence should instead be dismissed as "fruit of the poisonous tree" in light of the illegal interrogation.[5]

The Appellate Division first found that defendant's pre-Miranda statements to Officer Archibald in the courtyard were correctly suppressed

---

[5]  Defendant did not cross-move for leave to challenge the Appellate Division's determination regarding the physical evidence, so that issue is not before this Court. On remand, the trial court will consider whether the physical evidence must be suppressed as fruit of the illegal interrogation.

19

because defendant was subjected to custodial interrogation at that time and had not yet been <u>Mirandized</u>. The appellate court next found that defendant's post-<u>Miranda</u> statements to Officer Archibald were also properly suppressed because Officer Archibald "never asked defendant if he wished to waive his rights and speak to the police . . . and thereby conducted an incomplete inquiry on the question of waiver." Moreover, the court found that, because police gave the <u>Miranda</u> warnings "mid-stream," failed to mention the inadmissibility of defendant's prior incriminating statements, and advised defendant that he was "not under arrest" and "not in trouble," the officers impermissibly undermined the efficacy of the <u>Miranda</u> warnings. The Appellate Division agreed with the trial court that the totality of the circumstances did not support a finding of waiver as to defendant's courtyard statements to Officer Archibald.

The Appellate Division also found defendant's statements to Detectives Tredo and Rodriguez inadmissible. The court relied, in part, on the since-overturned Appellate Division decision in <u>Sims</u> in concluding that the "failure to inform defendant of the charges for which he was being placed under arrest was fatal to eliciting a valid waiver." The court noted that the totality of the circumstances also supported a finding of no valid waiver, given that

20

defendant had no prior contact with the criminal justice system and expected to go home at the end of the interrogation.

We granted the State's motion for leave to appeal. 249 N.J. 348 (2021). We granted the applications of Centurion Ministries, Inc., the County Prosecutor's Association of New Jersey, the Association of Criminal Defense Lawyers of New Jersey (ACDL), and the Attorney General to appear as amici curiae.

## II.

## A.

The State argues that the Appellate Division erred in affirming the suppression of defendant's statements, arguing that defendant validly waived his Miranda rights. As to defendant's statements in the courtyard, the State asserts that Miranda warnings were not necessary until the point in time when Officer Archibald provided them, and defendant implicitly waived his rights by nodding his head in response and proceeding to answer the officers' questions. The State further contends that the validity of defendant's implicit waiver was not impacted by Officer Archibald's statements that defendant was "not under arrest" and "not in trouble."

The State argues that the Appellate Division erred in relying on the then-stayed and since-overruled Appellate Division decision in Sims to suppress

21

defendant's statements at police headquarters, which requires a reversal and remand to the Appellate Division as to those subsequent statements. The State argues that defendant understood, by reading the waiver portions of the Miranda form out loud, that his signatures were confirmation of his waiver.

Amicus curiae the County Prosecutor's Association supports the State's position and contends both the trial court and Appellate Division improperly relied on Sims, which requires this Court to remand this case for analysis under the totality of circumstances.

The Attorney General takes no position on the outcome of this case, instead asking only that the determination of whether defendant validly waived his rights be made under the proper standard -- the totality of circumstances.

B.

Defendant argues that the decisions of the trial court and the Appellate Division should be affirmed because the State failed to show that he knowingly, voluntarily, and intelligently waived his Miranda rights. Defendant contends that he was subjected to custodial interrogation in the courtyard and that the totality of the circumstances decisively weighs against finding implicit waiver as to the statements he made there. Defendant highlights the officers' lack of inquiry into whether he wanted to waive his rights; the misleading statement immediately preceding the warnings that

22

defendant was "not under arrest" and "not in trouble"; his lack of familiarity of the criminal justice system; and the rapid and cursory manner in which the warnings were delivered.

Defendant argues that his statements to Detectives Tredo and Rodriguez at police headquarters must also be suppressed because by that point, the cat was out of the bag -- defendant had already incriminated himself -- and the second set of <u>Miranda</u> warnings were ineffective to purge the taint of the earlier unlawful interrogation. Defendant submits that the third set of <u>Miranda</u> warnings suffered from the same deficiencies as the first two, such that no reasonable person would have believed there was a real choice to invoke the rights.

Amici curiae Centurion Ministries and the ACDL support defendant's position. Centurion Ministries argues that the trial court appropriately found that defendant did not execute a proper waiver of his <u>Miranda</u> rights because the <u>Miranda</u> warnings given to defendant after his unwarned confession in the courtyard were ineffective. Centurion Ministries submits that the officers minimized the importance of the <u>Miranda</u> warnings by telling defendant that he was not in trouble and suggesting that administering the rights was a mere formality. Centurion Ministries also asserts that defendant did not expressly or implicitly waive his <u>Miranda</u> rights under the totality of the circumstances.

23

The ACDL argues that the State failed to prove beyond a reasonable doubt that defendant validly waived his Miranda rights both under the totality of the circumstances and because police affirmatively misled and misinformed defendant as to his "true status." Additionally, the ACDL agrees with the trial court that the officers' failure to ascertain whether defendant understood and agreed to waive his rights was fatal to a finding of a valid waiver.

## III.

### A.

Our review of a motion to suppress is limited and deferential. State v. Ahmad, 246 N.J. 592, 609 (2021). Generally, "we defer to the factual findings of the trial court if those findings are supported by sufficient credible evidence in the record." State v. Sims, 250 N.J. 189, 210 (2022). Our deference recognizes the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). A trial court's legal conclusions, "however, and the consequences that flow from established facts," are reviewed de novo. State v. Hubbard, 222 N.J. 249, 263 (2015).

24

B.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. Nyhammer, 197 N.J. 383, 399 (2009).

In Miranda, the United States Supreme Court declared that a person who is "subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way," 384 U.S. at 477, "must be adequately and effectively apprised of his rights," id. at 467. The Miranda Court instructed that the following warnings must be given to a person in police custody before an interrogation begins: that the person has the right to remain silent, that he has the right to retained or appointed counsel, that anything said can and will be used against him in court, and "that he can exercise his rights at any time during the interrogation." Id. at 479.

Consequentially, "[a] confession or incriminating statement obtained during a custodial interrogation may not be admitted in evidence unless a defendant has been advised of his or her constitutional rights." Hubbard, 222 N.J. at 265. The Miranda warnings ensure "that a defendant's right against self-incrimination is protected in the inherently coercive atmosphere of custodial interrogation." State v. A.M., 237 N.J. 384, 397 (2019). "The

25

essential purpose of <u>Miranda</u> is to empower a person . . . with knowledge of his basic constitutional rights so that he can exercise, according to his free will, the right against self-incrimination or waive that right and answer questions." <u>Nyhammer</u>, 197 N.J. at 406.

Whether an individual is in custody for <u>Miranda</u> purposes turns on "whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." <u>State v. P.Z.</u>, 152 N.J. 86, 103 (1997). The inquiry is an objective one, determined by "how a reasonable [person] in the suspect's position would have understood his situation." <u>Hubbard</u>, 222 N.J. at 267 (alteration in original) (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984)). The inquiry is not based "on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Ibid.</u> (quoting <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994)).

The <u>Miranda</u> Court held that, after an individual is given <u>Miranda</u> warnings and apprised of the rights, that person "may waive effectuation of [those] rights, provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S. at 444. To establish that an individual waived the <u>Miranda</u> rights under New Jersey law, the State "must prove beyond a

26

reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances."  State v. Tillery, 238 N.J. 293, 316 (2019) (quoting State v. Presha, 163 N.J. 304, 313 (2000)).  A waiver may be express or implied -- "[a]ny clear manifestation of a desire to waive is sufficient."  Ibid. (alteration in original) (quoting A.M., 237 N.J. at 397); see also State v. Kremens, 52 N.J. 303, 311 (1968).

"[A] knowing, intelligent, and voluntary waiver is determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court."  A.M., 237 N.J. at 398.  In that inquiry, factors commonly considered include the defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved."  Nyhammer, 197 N.J. at 402 (quoting Presha, 163 N.J. at 313).  The factors are assessed "qualitatively, not quantitatively," because "the presence of even one of those factors may permit the conclusion that a confession was involuntary."  State v. Hreha, 217 N.J. 368, 384 (2014).

Whether the defendant had prior experience with the criminal justice system is also relevant to the totality of the circumstances analysis.  Id. at 383.  Additionally, courts may consider statements and behaviors by the police

27

because "[a] police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other." State v. O.D.A.-C., 250 N.J. 408, 420-21 (2022) (alteration in original) (quoting State v. L.H., 239 N.J. 22, 44 (2019)); see also State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003) (noting that an officer's assurance that the defendant's statement could be made "off-the-record" following the administration of Miranda warnings "totally undermine[d] and eviscerate[d]" the warnings). For example, telling a suspect that the Miranda warnings are a mere "formality" tends to "downplay[] their significance" and weighs against a finding of waiver. O.D.A.-C., 250 N.J. at 422; see also Tillery, 238 N.J. at 319 (instructing that police "should scrupulously avoid making comments that minimize the significance of the suspect's" waiver of the Miranda rights).

## C.

At issue in this appeal is a two-step "question-first, warn-later" interrogation, where police elicit incriminating statements from a defendant before administering Miranda warnings. State v. O'Neill, 193 N.J. 148, 180-81 (2007); State v. Carrion, 249 N.J. 253, 275-76 (2021). "A natural concern in those circumstances is that 'after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed.'"

28

Carrion, 249 N.J. at 275-76 (quoting United States v. Bayer, 331 U.S. 532, 540-41 (1947)). We have found that this psychological pressure may affect the voluntariness of a subsequent waiver. Id. at 276 (citing O'Neill, 193 N.J. at 180-81).

In O'Neill, we held that when police elicit incriminating information during a custodial interrogation and only afterwards administer Miranda warnings, "the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination." 193 N.J. at 180-81. There, the defendant was interrogated by two homicide detectives for 95 minutes without Miranda warnings and made several incriminating statements by admitting to his involvement in a plot to rob the victim but claiming he abandoned the scheme. Id. at 157, 182. Those unwarned incriminating statements provided police with "a motive, opportunity, and personal involvement in a crime that the detectives were able to exploit in further questioning defendant." Id. at 182.

This Court found that by the time the detectives finally advised the defendant of his rights, the "defendant had committed himself to a story, and incriminated himself, and in all likelihood crossed a psychological bridge from which there was no turning back." Id. at 169-70. We held that because the

29

detectives gave <u>Miranda</u> warnings "midstream" and did not tell the defendant that his prior incriminating statements could not be used against him at trial, the "defendant lacked sufficient information needed to make a knowing, voluntary, and intelligent waiver of the privilege."  <u>Id.</u> at 183.

In <u>O'Neill</u>, we adopted the following non-exhaustive list of factors for courts to consider when assessing whether the warnings provided in the second interrogation functioned effectively:

> (1) the extent of questioning and the nature of any admissions made by defendant before being informed of his <u>Miranda</u> rights; (2) the proximity in time and place between the pre- and post-warning questioning; (3) whether the same law enforcement officers conducted both the unwarned and warned interrogations; (4) whether the officers informed defendant that his pre-warning statements could not be used against him; and (5) the degree to which the post-warning questioning is a continuation of the pre-warning questioning.
>
> [<u>Id.</u> at 181.]

Though no one factor is dispositive, a court should give "great weight" to whether the police "informed a suspect that his admissions made prior to being given the <u>Miranda</u> warnings could not be used against him" because "[p]roviding that information would strongly suggest that the defendant made any post-warning incriminating statements knowingly, voluntarily, and intelligently."  <u>Ibid.</u>  However, "failure to give that instruction will not

30

automatically render the defendant's post-<u>Miranda</u> statements inadmissible."

<u>Ibid.</u> Therefore, "[i]n a two-step interrogation case, courts must view the totality of the circumstances in light of the relevant factors and then determine whether the unwarned questioning and admissions rendered the <u>Miranda</u> warnings ineffective in providing a defendant the opportunity to exercise the privilege." <u>Id.</u> at 181-82.

This Court recently applied the <u>O'Neill</u> factors to a two-step interrogation in <u>Carrion</u>. <u>See</u> 249 N.J. at 282-84. There, the defendant admitted ownership of a black bag containing a weapon after officers informed him that if he didn't tell the officers whether "he had something in the house" then "they were going to call DY[FS]" and take his children.[6] <u>Id.</u> at 262 (alteration in original) (footnote omitted). Afterwards, the defendant was brought to police headquarters where he was <u>Mirandized</u>, executed a waiver, and again admitted that the weapon found in the black bag was his. <u>Id.</u> at 263.

We found that factors two, three, and five favored admission of the defendant's post-warning statement because the second interview took place in a different location six hours after the initial confession; different officers conducted both the unwarned and warned interrogations; and "the post-

---

[6] "DYFS" refers to the Division of Youth and Family Services, presently known as the Division of Child Protection and Permanency.

31

warning questioning was not 'a continuation of the pre-warning questioning.'" Id. at 282-83 (quoting O'Neill, 193 N.J. at 181). However, we found that factors one and four favored suppression. Id. at 283. As to factor one, the defendant "faced two sources of psychological pressure not to assert his Miranda rights in his second interview: the fact that he had already let the cat out of the bag in his first statement, and the potential belief that the threat to call DYFS, unless he admitted ownership of the black bag, was still in effect." Id. at 282. And as to factor four, the defendant was not informed "that his pre-warning statements could not be used against him." Id. at 283 (quoting O'Neill, 193 N.J. at 181). We held that factors one and four pushed the totality of circumstances in the defendant's favor and required suppression. Id. at 284.

IV.

Applying those principles to this case, we first must determine whether defendant was in custody when he made the incriminating statements to police in the courtyard.

When he encountered defendant in the hallway of the residence hall, Officer Archibald confirmed defendant's identity and advised defendant that the officer was there to investigate an incident. When Officer Archibald's partners could not find his location, Officer Archibald escorted defendant out

32

into the courtyard. With three uniformed, armed officers surrounding defendant and asking him questions about the alleged threats, it is evident from the body-worn camera footage that defendant's freedom of movement was limited. It is hard to imagine that a reasonable person in defendant's position would have felt free to leave under those circumstances. We therefore agree with the trial court and the Appellate Division that defendant was in custody as the officers questioned him in the courtyard.

Given that defendant was in custody, he should have been read his Miranda rights prior to Officer Archibald asking questions that were "reasonably likely to elicit an incriminating response." See Hubbard, 222 N.J. at 267 (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). Upon meeting with the two additional officers in the courtyard, Officer Archibald asked defendant, "why are we here tonight?" When defendant responded, "[b]ecause I made a statement," Officer Archibald then asked, "[w]hat statement did you make?" In response, defendant stated, "[l]ike I want to harm someone," specifically, "[his] girlfriend and her family." Without a doubt, defendant should have been advised of his rights prior to the start of this interrogation, which immediately yielded incriminating admissions.

It was not until defendant made that admission that Officer Archibald advised defendant of his right to remain silent in an abridged version of the

33

<u>Miranda</u> rights.  There was no <u>Miranda</u> form available to the officers at the time, so the warnings were not a full recitation of the advice of rights <u>Miranda</u> requires.

Furthermore, prior to providing defendant with the inadequate <u>Miranda</u> rights, Officer Archibald advised defendant, "[l]ook before any of this goes anywhere else right now, you are not under arrest.  You are not in trouble.  I'm going to advise you of your <u>Miranda</u> rights, ok?"  Not only were the <u>Miranda</u> rights Officer Archibald read to defendant deficient, but the officer undermined those rights by telling defendant, who was at that point in police custody and a suspect in an attempted murder investigation, that he was not in trouble.  Certainly, under those circumstances, defendant was in some peril, particularly after having just admitted to police that he made statements about harming two people.  Telling defendant that he was "not in trouble" was an affirmative misrepresentation.  Under the totality of the circumstances, the statements that defendant made in the courtyard must be suppressed because the <u>Miranda</u> warnings given in the courtyard were lacking[7] and could not have

---

[7] The trial court and the Appellate Division found the fact that the officers did not explicitly ask defendant whether he waived his rights in the courtyard and at police headquarters to be outcome determinative.  We do not make such a finding and instead hold that based on the totality of the circumstances any alleged waiver was invalid.

34

apprised defendant of his rights such that any waiver and agreement to speak to police was knowingly, voluntarily, and intelligently made.[8]

After briefly advising defendant of his rights, the officer immediately resumed questioning. Officer Archibald asked defendant to repeat exactly what he said about harming his girlfriend's parents, to which defendant responded, "I said I would kill my girlfriend's parents." Not long after making that admission, the officers transported defendant to Rutgers Police headquarters.

At police headquarters, defendant was placed in an interview room and waited four hours before being interrogated by Detectives Tredo and Rodriguez. Prior to the interrogation, Detective Tredo read defendant his Miranda rights and defendant initialed after every line to confirm his understanding. The interrogation proceeded and defendant made more inculpatory statements, including how he planned to carry out the murders and that he enlisted a friend to be his getaway driver.

By the time defendant arrived at the police department and was given full Miranda warnings, however, he had already admitted to the very crime

---

[8] Because we find that the State has failed to prove beyond a reasonable doubt that defendant knowingly, voluntarily, and intelligently waived his Miranda rights in the courtyard, our discussion of defendant's pre-Miranda statements refers to the entirety of defendant's admissions in the courtyard.

35

that the officers were investigating.  Defendant had let the cat out of the bag with his admissions, so the psychological pressure of having already confessed was not cured by the administration of <u>Miranda</u> warnings.

In applying this Court's holding in <u>O'Neill</u> to this case, the factors weigh in favor of suppressing all of defendant's statements.

With regard to the first factor -- the extent of questioning prior to being informed of <u>Miranda</u> and the nature of any admissions -- although the pre-<u>Miranda</u> questioning in the courtyard did not last long, the substance of defendant's admissions was significant.  Within minutes of encountering defendant and asking him questions about why the officers were there, defendant fully admitted to making the threatening statements that the officers were investigating.  The first factor, therefore, weighs in defendant's favor.

The second and third factors, the proximity in time and place between the pre- and post-warning questioning and whether the same law enforcement officers conducted both statements, weigh in favor of the State and admission of the statements.  The pre-warning statement occurred in the courtyard outside the residence hall and the post-warning statement occurred after defendant had been transported to police headquarters.  Two different Rutgers police detectives took defendant's statement approximately four hours after arriving at the station.

36

Regarding factor four, the detectives did not inform defendant that his prior statements could not be used against him, so this factor weighs in defendant's favor. Defendant had already made damning admissions about planning to kill his girlfriend's parents. By the time detectives read him his Miranda rights at the police station, defendant had already incriminated himself "and in all likelihood crossed a psychological bridge from which there was no turning back." See O'Neill, 193 N.J. at 170. When he waived his Miranda rights in advance of the police station interrogation, defendant had no idea that the incriminating statements he made in the courtyard could not be used against him if he chose not to waive his rights. Defendant was still operating under "the psychological and practical disadvantages of having confessed" prior to the stationhouse interrogation. See Carrion, 249 N.J. at 276. This factor weighs heavily against admission.

The final factor -- whether the post-warning questioning was a continuation of the pre-warning questioning -- likewise weighs in favor of suppression. Prior to the start of the police station interrogation, Detective Tredo stated that she was aware defendant previously spoke to the other officers, "[b]ut we just have to do it again." Detective Tredo further noted that "patrol took a statement" regarding the comments defendant made. Linking the pre- and post-warning statements together in that manner and giving

37

defendant the impression that the statement at the police station was a repeat of the statements he already made certainly could have given defendant the impression that the post-warning statement was simply a continuation of the first.

It is also important to acknowledge defendant's lack of familiarity with the criminal justice system. In O'Neill, we noted that a defendant's prior experience with the criminal justice system may be considered in reviewing the totality of the circumstances in two-step interrogation cases. 193 N.J. at 181. Defendant's inexperience in criminal matters was evident, for example, in defendant asking police whether he could go to jail for making statements, asking if he would be allowed to go home and "continue [his] day" if he gave police consent to search his cell phone, and noting to police that he did not understand the process of consenting to the search of his car.

Under those circumstances, the Miranda warnings administered at the police station did not give defendant "a meaningful opportunity to exercise his rights," so we find that defendant's waiver prior to the second interrogation was not made knowingly, voluntarily, and intelligently. See id. at 180.

The Appellate Division, in line with its decision in Sims, 466 N.J. Super. 346, held that the failure of the officers to tell defendant of the charges for which he was subject to a probable cause arrest was "fatal to eliciting a valid

38

waiver."  Subsequent to the appellate court's opinion in this matter, this Court reversed the Appellate Division's decision in <u>Sims</u> and held that when neither a complaint nor an arrest warrant has been issued, law enforcement officers are not required to inform an arrestee of what charges the arrestee may be facing prior to conducting an interrogation.  <u>Sims</u>, 250 N.J. at 217.  The appellate court's partial reliance on the now-reversed Appellate Division holding in <u>Sims</u> is therefore no longer viable.  In its ruling, however, the Appellate Division noted that the factors cited by the trial court under the totality of the circumstances analysis "also support the conclusion that there was no valid waiver," as we now hold.

V.

For the forgoing reasons, we affirm as modified the Appellate Division's judgment.

CHIEF JUSTICE RABNER; JUSTICES PATTERSON, WAINER APTER, and FASCIALE; and JUDGE SABATINO (temporarily assigned) join in JUSTICE PIERRE-LOUIS's opinion.  JUSTICE SOLOMON did not participate.